2016V02338/SD/
CRAIG CARPENITO
United States Attorney
By: Sarah Devlin
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel: 973-645-2740
sarah.devlin3@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Hon. |
| -v- | : | Civil Action No. 18- |
| THE REAL PROPERTIES KNOWN AS | : | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| 50 RIVERSIDE BOULEVARD, UNIT 21B NEW YORK, NEW YORK; | : | |
| 2 RIVER TERRACE, UNIT 12J NEW YORK, NEW YORK; | : | |
| 40 BROAD STREET, UNIT 20FG NEW YORK, NEW YORK; AND | : | |
| 18 AND 19 COLTS GAIT LANE COLTS NECK, NEW JERSEY, | : | |
| Defendants *in rem*. | : | |

Plaintiff, United States of America, by its attorney, Craig Carpenito, United States Attorney for the District of New Jersey (by Sarah Devlin, Assistant United States Attorney), brings this Verified Complaint for Forfeiture *in Rem* (the "Complaint") and alleges as follows, in accordance with Rule G(2) of the

1

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure.

## **NATURE OF THE ACTION**

1.     This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States the above-captioned property pursuant to Title 18, United States Code, Section 981(a)(1)(C), as property constituting, and derived from, proceeds traceable to a violation of Title 18, United States Code, Section 1343, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, or a conspiracy to commit such an offense, and pursuant to Title 18, United States Code, Section 981(a)(1)(A), as property that was involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 or 1957, or a conspiracy to commit such a violation, in violation of Section 1956(h).

## **THE DEFENDANTS *IN REM***

2.     The defendants *in rem* consist of the following:

The real property known as 50 Riverside Boulevard, Unit 21b, New York, New York (the "50 Riverside Condo");

The real property known as 2 River Terrace, Unit 12J, New York, New York (the "2 River Terrace Condo");

The real property known as 40 Broad Street, Unit 20FG, New York, New York (the "40 Broad Street Condo"); and

The real property known as 18 and 19 Colts Gait Late, Colts Neck, New Jersey (the "Colts Neck Property")

(collectively, the "defendants *in rem*" or the "defendant properties").

3.      The defendant properties have not been seized but are within the jurisdiction of the Court.  The United States does not request authority from the Court to seize the defendant properties at this time.  The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

a.      post notice of this action and a copy of this Complaint for Forfeiture *In Rem* on the defendant properties; and

b.      serve notice of this action on the defendant properties' owner(s), and any other person or entity who may claim an interest in the defendant properties along with a copy of this Complaint; and

c.      file a Notice of Lis Pendens against the defendant properties.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.      This Court has *in* rem jurisdiction over the defendant properties under 28 U.S.C. § 1355(b).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1), because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey.

## STATUTORY BACKGROUND

7.      Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity," as defined in 18 U.S.C.

§ 1956(c)(7), or any conspiracy to commit any such offense, is forfeitable to the United States.

8.    Pursuant to 18 U.S.C. § 1956(c)(7)(A), the definition of specified unlawful activity includes any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).  The offenses listed in Sections 1956(c)(7) and 1961(1)(B) include wire fraud, in violation of 18 U.S.C. § 1343, and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, or a conspiracy to commit such offenses.

9.    Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 or 1957, is forfeitable to the United States.

## FACTS

10.    During the period relevant to this Complaint:

a.    "Company A" was a publicly-traded company that, through a web of operating subsidiaries, provided outsourced revenue cycle management ("RCM"), physician practice management, and other related services to hospitals and medical practices in the United States.  Company A was incorporated in Delaware in or around September 2014 for the purpose of becoming a holding company for the "Operating Company," which owned several subsidiary entities engaged in the businesses referenced above.  In or around December 2014, Company A's securities began trading on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE").

4

Company A was later taken private through a domestic merger transaction consummated in the United States and described below, which closed on or about January 30, 2017.

b.      The "Private Investment Firm" was a private investment management firm based in New York City that sought to acquire, own and operate businesses by providing long-term capital solutions.

c.      Parmjit Parmar, a/k/a "Paul Parmar" ("Parmar"), was a resident of New Jersey and was the Chief Executive Officer of Company A from its inception through in or about September 2017.  Parmar also was a member of Company A's board of directors.  Until in or around January 2017, Parmar, and various other entities he owned and controlled, owned the majority of Company A's shares.

d.      Sotirios Zaharis, a/k/a "Sam Zaharis" ("Zaharis"), was a resident of New Jersey and was the Chief Financial Officer of Company A.  He also served on its board of directors.

e.      Ravi Chivukula ("Chivukula") was a resident of New Jersey and served as the Chief Financial Officer of the Operating Company.  He also was a member of Company A's board of directors.

11.      Between in or about May 2015 through in or about September 2017, Parmar, Zaharis, and Chivukula (collectively, the "co-conspirators") orchestrated an elaborate scheme to defraud the Private Investment Firm and others out of hundreds of millions of dollars in connection with the funding of a "going private" transaction whereby Company A, which was publicly traded on

the LSE's AIM, was taken private through a series of transactions that will be referred to herein collectively as either the "Go-Private Transaction" or the "Merger."  As part of the financing of the Go-Private Transaction, the Private Investment Firm put up approximately $82 million in equity and a consortium of financial institutions (the "Lenders") provided another approximately $130 million in debt.  The scheme was accomplished through a variety of fraudulent methods designed to grossly inflate the value of Company A and trick the Private Investment Firm and others into believing that Company A was worth substantially more than its actual value.

12.     The scheme to present a materially false picture of the financial health of Company A began with several secondary offerings on the AIM whereby the co-conspirators sought to raise tens of millions of dollars in the public markets purportedly to fund Company A's acquisitions of various operating subsidiaries.  In reality, a number of those entities either did not exist or had only a fraction of the operating income attributed to them.  The evidence developed to date indicates that the co-conspirators then funneled the proceeds of these secondary offerings through bank accounts they controlled and used the money for a variety of purposes that had nothing to do with acquiring the purported acquisition targets.  Rather, the money from one of the offerings was used to, among other things, make it appear as if the Operating Company had substantial customer revenue when, in fact, the funds were simply transfers of the money that had been raised in the secondary offering. The co-conspirators went to great lengths to make it appear that these funds

were revenue, concocting phony customers and altering bank statements to make it appear as if the funds were coming from customers.  In fact, the purported revenues and, in many cases, the customers, were complete fabrications.

13.     The co-conspirators employed a variety of fraudulent techniques before and in the course of the Go-Private Transaction to induce the Private Investment Firm and others to fund the transaction.  These tactics included, but were not limited to: (1) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions that the co-conspirators simply made up; (2) falsifying and, in some cases, wholly fabricating, bank records of subsidiary entities in order to generate a phony picture of Company A's revenue streams; (3) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; (4) and making other material misrepresentations and omissions to representatives of the Private Investment Firm and others.  Through these actions, the co-conspirators caused the Private Investment Firm and others to value Company A at over $300 million for purposes of financing the Go-Private Transaction.

**A.**     **Background of the Go-Private Transaction**

14.     Between no later than in or around April 2016 and November 2016, the Private Investment Firm and Company A engaged in negotiations relating to the Go-Private Transaction.  The Go-Private Transaction was structured so that a special purpose entity managed by the Private Investment

Firm would ultimately own a controlling interest in Company A and the balance would be owned by a Parmar-controlled entity.

15.     During the negotiations of the Go-Private Transaction and related due diligence activities by the Private Investment Firm, Parmar controlled Company A and was the key member of its senior management interfacing with the Private Investment Firm.  Zaharis and Chivukula actively supported Parmar in these efforts.

16.     In or around June 2016, the co-conspirators made a presentation to the Private Investment Firm during which they portrayed Company A as a growing force in the medical billing industry, touting the company's expansion of operations into over twenty states through its organic growth and numerous acquisitions, including the following three separate purported medical billing and/or RCM businesses: MDRX Medical Billing ("MDRX"); Phoenix Health, LLC ("Phoenix"); and Northstar First Health, LLC ("Northstar").

17.     Pointing to organic growth and Company A's acquisitions, Parmar represented to the Private Investment Firm that Company A's EBIDTA[1] and revenue were growing rapidly and exceeded expectations in the fifteen months following its listing on the AIM.

18.     Additionally, during the negotiations, the co-conspirators provided extensive documents to the Private Investment Firm regarding Company A's purported financial condition, performance, and business operations.  These

---

[1] "EBIDTA" refers to a company's earnings before interest, taxes, depreciation, and amortization and is a measure commonly used to evaluate a company's financial performance in a given period of time.

documents included Company A's public filings on the AIM, presentations that the co-conspirators made to the Private Investment Firm, financial statements for certain of Company A's subsidiary companies, information about numerous purported customers of Company A and its subsidiaries, bank records, and customer contracts. The co-conspirators represented to the Private Investment Firm that the information in these materials was true and accurate, and the Private Investment Firm relied on these representations in deciding to pursue the Go-Private Transaction. As explained further below, however, many of these documents contained material misrepresentations or omissions, or were completely fabricated by the co-conspirators, in furtherance of the scheme.

19.     Based upon the information provided by the co-conspirators, the Private Investment Firm valued Company A at more than $300 million.

20.     In furtherance of the Go-Private Transaction, Company A, through Parmar, made specific representations and warranties in the merger agreement and subscription agreement (the "Merger Documents") that the Private Investment Firm ultimately signed. Specifically, Company A represented in the merger agreement that its financial statements were truthful and accurate, that there were no false entries in Company A's accounting records, that Company A's accounts receivable were the result of legitimate transactions, and that its material contracts were real and enforceable. Notably, Parmar and certain of his controlled entities also agreed in the subscription agreement to indemnify the Private Investment Firm for "any intentional misrepresentations and fraud on the part of [Company A] or any seller."

9

21.     In reliance of the co-conspirators' material misrepresentations and omissions, on or about November 24, 2016, the Private Investment Firm signed the Merger Documents to consummate the Go-Private Transaction.  Pursuant to the terms of the Merger Documents, the Private Investment Firm agreed to pay approximately $88 million in cash for a 50.7% economic interest in Company A after its conversion to a private entity following the transaction.  As set forth in the subscription agreement, the Private Investment Firm received approximately 30,268,763 Class A Units of the newly formed entity.  Additionally, the Lenders agreed to lend up to approximately $145 million to finance the Merger.  Company A issued unsecured promissory notes to its shareholders to generate the remaining approximately $40 million.  Parmar, as Company A's largest shareholder, received the majority of the proceeds from the Go-Private transaction, and an approximately 49.3% economic interest in the new private company.  The Go-Private Transaction closed on or about January 30, 2017, with the Private Investment Firm contributing approximately $82.5 million in equity and the Lenders providing approximately $130 million in debt financing.

22.     As set forth below, the investigation to date has revealed several categories of fraudulent conduct by the co-conspirators in connection with the Go-Private Transaction.

**B.     Fake Operating Companies and Sham Acquisitions**

23.     Between in or around May 2015 and February 2016, the co-conspirators orchestrated sham acquisitions by Company A of MDRX, Phoenix,

and Northstar to inflate Company A's revenues, EBIDTA, and overall value.

Each of the three transactions followed a similar pattern: Company A raised

money for the purported acquisition through a secondary stock offering on the

AIM; the target or acquired company was formed only shortly before the

announced acquisition; and the funds raised for the acquisition appear to have

been used for other purposes.  The co-conspirators nevertheless falsified the

books and records of Company A to cause its general ledger to appear as

though the funds raised during the secondary offerings had been used for the

acquisition.  Two of the three acquired companies, MDRX and Phoenix, were

fictitious entities that the co-conspirators created in connection with the

scheme.  The other company, Northstar, had at least one real asset, but the co-

conspirators grossly inflated the value of the company in furtherance of the

scheme.

     1.   *The MDRX Fraud*

*The Theft of a Corporate Identity*

    24.    One of the co-conspirators' fraudulent acquisitions involved the

purported purchase of MDRX.  The Federal Bureau of Investigation ("FBI")

reviewed a regulatory release Company A issued and filed with the LSE on or

about December 11, 2015, concerning the secondary offering of shares by

Company A and the purported use of a substantial portion of the proceeds to

acquire MDRX.  In particular, in a Regulatory News Service ("RNS")

announcement issued on December 11, 2015, entitled "Proposed Placing &

Conditional Acquisition," Company A announced its intention to raise

11

approximately £30 million (approximately $45.5 million) (before expenses) through a secondary offering on the AIM.  The December 11, 2015 RNS also announced that Company A "had entered into a conditional share purchase agreement to acquire MDRX for up to $30.0 million."  Parmar is quoted in the December 11, 2015 RNS as stating that "[t]he acquisition of MDRX will be our fourth acquisition since IPO last year and we are very excited about its prospects in the context of the Group."

25.    As noted in greater detail below, the investigation has revealed that, in reality, MDRX did not exist.  Not only did the co-conspirators fabricate this company, but documents and witness statements reflect that they also stole the description of MDRX that they used in the December 11, 2015 RNS from pitch materials Parmar and Zaharis had previously received relating to the possible recapitalization of a real company operating in the RCM space (hereafter referred to as Company M).

26.    In or about October 2015, financial advisors for Company M, who were seeking to recapitalize it, sent a confidential information memorandum ("CIM") to Company A for review by Parmar and Zaharis.  The CIM shows that it was furnished to potential investors on the understanding that it would be used only to evaluate whether to invest in Company M.

27.    Documents nevertheless show that the co-conspirators used the description of Company M in the CIM to generate the phony description of MDRX they used in the December 11, 2015 RNS, in many cases lifting the

description word for word from the CIM.  The remarkable similarities included the following:

a.  The CIM listed Company M as being based in Akron, Ohio, and contained references to Chicago, Cincinnati, Cleveland, Columbus and Wheeling.  The co-conspirators wrote in the RNS that MDRX was "based in Akron, Ohio and has offices in Chicago, Cincinnati, Cleveland, Columbus and Wheeling."

b.  The CIM described Company M as "a leading national provider of outsourced healthcare practice management and consulting services, including outsourced billing, collections operations and financial management primarily to both independent and health system-based physician groups."  The co-conspirators largely copied this description when writing about MDRX in the RNS:  "MDRX is a national provider of outsourced hospital practice management, private practice management and consulting services (including outsourced billing, collections, operations and financial management) to both independent and health system-based physician groups in the US."

c.  The CIM also contained a "Practice Overview" section which had as a subheading the following description:  "[Company M] offers a uniquely comprehensive set of turnkey healthcare management services, which allow medical practices to improve their profitability, cash cycle management and operations workflow."  The co-conspirators lifted this description almost verbatim and included it in the December 11,

13

2015 RNS, noting, "MDRX offers a comprehensive set of turnkey healthcare management services which allow medical practices to improve their profitability, cash cycle management and operations workflow."

28.    The same day that Company A issued the December 11, 2015 RNS announcing the secondary offering and the agreement to acquire MDRX, Zaharis received an email from one of the individuals who had served as a financial advisor for Company M in connection with its efforts to recapitalize. The financial advisor wrote: "Sam, I just left you a voicemail on an important matter concerning [Company A's] announcement of the MDRX acquisition.  In reading the press release we noticed that the company description appears nearly identical to the [Company M] description in our Confidential Information Memorandum (e.g., based in Akron, the last sentence is verbatim from our subheader on page 7).  As we are not familiar with MDRX, we wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise."  Zaharis promptly forwarded this email to others, including Parmar.  In one such email to an individual who will be referred to as Co-conspirator 1, Zaharis wrote, "Not good.................."  Co-conspirator 1 replied simply, "Oh fuck."  When Zaharis replied that he would call Co-conspirator 1, the latter responded, "Pls.  We need to be ready for this."

29.    Several days later, Zaharis and Parmar had scheduled a call with the financial advisor, and, on December 14, 2015, Zaharis sent Parmar an email entitled "Speech for the Broker of [Company M]."  Parmar replied by

asking Zaharis to have the document printed so Parmar would have it in front of him when he spoke with Company M's financial advisor.

30.     The FBI interviewed the financial advisor who represented Company M in its efforts to recapitalize about his interactions with Zaharis and Parmar.  The financial advisor stated that he had several calls with Zaharis and a call with Parmar about the possibility of Company A buying Company M. The financial advisor said that Zaharis had submitted an indication of interest on behalf of Company A, but that Company M had decided not to proceed with a sale from any of its potential buyers.  The financial advisor added that sometime later, he saw a press release from Company A describing the purchase of a company that did the same thing as Company M.  The financial advisor noted that the press release used either the exact language or language that was very similar to that used by Company M in its CIM.  The financial advisor said he contacted Zaharis about the similarities, and Zaharis said he would look into it.  Zaharis then called back several days later and told the financial advisor that his public relations firm had two books and had mistakenly taken language from the wrong book.

31.     The explanation given by Zaharis to the financial advisor that there was a mix-up by Company A's public relations firm is belied by other documents showing that Zaharis, Parmar, and Chivukula knowingly stole the description of MDRX directly from Company M's CIM.  In a series of emails Chivukula sent to Parmar and Zaharis on October 22, 2015, Chivukula made clear that he was creating, among other documents, a document called MDRX

15

Medical Billing LLC Due Diligence Findings.  The FBI has reviewed the
document with this label and it contains nearly identical sections to the
Company M CIM.  Chivukula's emails make clear that he was using the
Company M CIM to create the purported MDRX Due Diligence Findings.  For
instance, when he circulated the draft to Parmar and Zaharis, Chivukula noted
that he was "not able to edit the name of [Company M] in the header."  He also
noted that he was "not able to remove the background image of [Company M]
in the presentation."

*False Representations Concerning MDRX's Revenue*

32.     Having stolen the corporate identity of Company M and fabricated
a company they called "MDRX Medical Billing LLC," the co-conspirators
proceeded to falsely represent that MDRX was a real, viable company with a
substantial customer base and significant revenues.

33.     On or about February 10, 2016, Company A issued a press release
announcing its acquisition of MDRX for $28 million, stating that MDRX had "a
nationwide presence and brings approximately 3,500 more physicians on the
[Company A] platform."  In the announcement, Parmar made the following
statement:

> The closing of the MDRX transaction will further increase [Company A's]
> revenue and significant cost savings will be borne out by MDRX being
> part of the [Company A] platform.  MDRX will be our fourth acquisition
> since our IPO.  We continue to evaluate a pipeline of acquisition
> opportunities which meet our strict criteria of being able to generate
> recurring revenue while generating significant profitability.  MDRX
> augments the existing Physicians on the [Company A] platform in States
> such as California, Florida and New York and adds new geographies
> such as Alabama, Louisiana, New Mexico and Utah. With this
> transaction completed [Company A] will collect approximately $2 billion

16

annually for physicians across the US and will increase our footprint in new territories.

34.   Numerous documents obtained during the investigation demonstrate that MDRX did not exist prior to this transaction.  According to the Certificate of Formation for MDRX, the company was formed on December 7, 2015, right before the December 11, 2015 RNS announcing the secondary offering and the purported MDRX transaction, and approximately two months before the acquisition purported to close.  Moreover, the stock purchase agreement between MDRX and Company A is a 58-page, detailed contract, the likes of which typically would be heavily negotiated over the course of time between the parties to the contract.  Here, however, the stock purchase agreement is dated December 7, 2015 – the very day on which MDRX purportedly was formed.  The signature block corresponding to MDRX on page 58 of the stock purchase agreement reflects that it was signed by "Jack White," purportedly the CEO of MDRX.  In addition, the stock purchase agreement reflects that MDRX's address was "166 High Street" in Akron, Ohio.  The FBI has confirmed through various investigative steps that there is no "166 High Street" in Akron, Ohio.  Although there is a 166 "S. High Street," that address is occupied by the City of Akron's government offices.  No entity with MDRX's name has operated there.

35.   Email communications reviewed in the investigation further demonstrate the fraudulent nature of Company A's purported acquisition of MDRX.  For instance, on or about September 23, 2016, Zaharis sent Chivukula an email with the subject line "who did we say we acquired MDRX from."

Zaharis went on to write the following in the body of the email: "My hard drive with the info is upstairs in the bed room [sic] and they are all sleeping." Chivukula responded by writing simply, "APEX healthcare systems[.]"

36.     In an earlier email dated March 11, 2016, Zaharis sent Chivukula a copy of a notice to MDRX from the IRS advising MDRX that the IRS had assigned it an employer identification number ("EIN").  The date of the notice is March 11, 2016.  This document reflects that MDRX did not have an EIN, a basic identifier used by companies doing business in the United States, until over a month after the announcement of Company A's acquisition of it.

37.     The co-conspirators not only fabricated MDRX, but they misrepresented to the Private Investment Firm during the due diligence phase of the Go-Private transaction that it had substantial earnings prior to its purported acquisition by Company A.  For instance, on or about October 14, 2016, Parmar sent an email to a representative of the Private Investment Firm who was responsible for much of the financial due diligence and to Zaharis. The subject of the email was "Updated financials."  Parmar attached to the email a spreadsheet purporting to be Company A's "Consolidated Financial Model."  The model contained a tab that purported to show MDRX's consolidated statements of operations.  Despite the fact that MDRX was not even formed as a corporate entity until December 7, 2015, this consolidated statement of operations falsely showed positive earnings information dating as far back as January 2015.

38.     Bank records and other documents also show that, in connection with the secondary offering announced on December 11, 2015, that supposedly was going towards funding the (bogus) acquisition of MDRX, the co-conspirators diverted those funds to other uses, and falsified the books and records of Company A.  A comparison of Company A's general ledger and its associated bank accounts reflects efforts by the co-conspirators to conceal the fraud.  Specifically, Company A's general ledger shows that Company A received approximately $36.8 million on or about January 8, 2016 from the capital raise in the secondary stock offering on the AIM.  The general ledger further shows disbursements of approximately $35 million on or about February 9, 2016, which were described as payment for the acquisition of MDRX.

39.     While the bank records confirm Company A's receipt of the approximately $36 million in January 2016, the transactions in the account in or around February 2016 and over the next several months establish that the funds were not used for an acquisition.  Rather, the bank records show numerous transfers to other accounts affiliated with Company A and/or other entities, including the Operating Company, Parmar, a law firm, and others.  Approximately $7 million of the funds was transferred to the Operating Company in a series of smaller transfers and recorded in the Operating Company's general ledger as "AR payments" from specific customers, many of which appear to be fake.  In reality, the co-conspirators simply funneled some of the proceeds from the stock offering to the Operating Company to create

fictitious customer income and to fraudulently inflate the company's revenue streams.

40.    For instance, on January 27, 2016, approximately $102,753 was sent from Company A's bank account to the Operating Company's bank account in four separate transfers.  Each incoming bank transfer supported a phony entry in the Operating Company's general ledger purporting to show that the money was a receivable from a medical practice customer of the Operating Company.  Law enforcement's investigation shows that, in reality, these transfers were simply inter-company transfers and that the medical practices that were supposedly paying the money to the Operating Company either did not exist or did not have a relationship with the Operating Company. This is demonstrated by the co-conspirators' efforts to lease temporary office space in the names of these and other purported customers of the Operating Company, as explained further below.

41.    This pattern of transfers designed to support false general ledger entries continued on numerous dates between January and July 2016 and resulted in millions of dollars in manufactured revenue to the Operating Company.  A detailed example of one of these related company transfers is described below in paragraph 56.

*2. Other Sham Acquisitions*

42.    Prior to the purported acquisition of MDRX, on or about September 16, 2015, Company A announced its acquisition of Northstar for approximately $18 million.  Company A's bank account statements reflect that, in May 2015,

Company A had raised approximately $15.8 million through a secondary stock offering on the AIM.  Company A's press release announcing the acquisition described Northstar as having a "stable client base of healthcare providers under recurring revenue contracts[,]" particularly 77 retained clients, as well as 233 employees (125 of which the release claims are in the United States, with the remaining employees in India).  The release also stated that Northstar had year-end revenue in 2014 of approximately $7.9 million and EBITDA of $1.9 million.

43.     According to Northstar's Certificate of Formation, it was formed on or about June 12, 2015, just a few months before Company A's claimed acquisition of it.  Moreover, according to a copy of a purchase agreement, on or about September 2, 2015, Northstar purchased a business (the "Business Asset") for approximately $2,785,000.  Further, based on a review of Company A's bank records, it does not appear that the approximately $15 million that it received from the secondary offering was used for an acquisition, other than the Business Asset.  Rather, the bank records show numerous transfers to other individuals and entities over the course of several months following the deposit of the offering proceeds.

44.     Last, on or about September 18, 2015, two days after Company A announced the Northstar transaction, Company A announced its acquisition of Phoenix, which it described as a company employing 138 people with revenue of $9.8 million as of the end of 2014.  According to the press release

announcing the acquisition, Company A acquired Phoenix for approximately $14 million.

45.    Notably, according to a Certificate of Formation obtained in the investigation, Phoenix was formed on September 11, 2015, just one week prior to the announcement of the acquisition.  Further, email communications between Chivukula, Zaharis and others, from October 2015 indicate that Phoenix did not have an EIN as of that time (over one month after the acquisition announcement).  Specifically, on or about October 28, 2015, Chivukula emailed one of Company A's outside attorneys (copying Zaharis) and asked, "Can you please send the incorporation documents for Phoenix.  We need to open a bank account and need these documents to get it going."  The attorney replied and attached certain documents and, in response, Chivukula stated, "Do you also have the EIN letter for Phoenix?"  The attorney responded, "No," and then Chivukula forwarded the attorney's response to Zaharis and stated, "Sam, we cannot open a bank account without an EIN number.  Normally, [the attorney's] office applies for these.  I can do this online too, but I need [Parmar's] SSN number."  After a few additional emails back and forth regarding the information needed to apply for an EIN, Chivukula emailed Zaharis and stated, "I am mentioning the location of the business as Houston, Texas.  Let me know if you think otherwise."  Zaharis responded, "Ok.  You can see from the rns where we say they are located."  Chivukula replied, "I need a physical address, and I am using the Houston office address."

46.     The Government has obtained a copy of a notice from the IRS to Phoenix dated November 27, 2015 advising it of its EIN.  The notice was issued to Phoenix at the address of Company A's principal place of business in Houston, Texas, as reflected in Company A's consolidated financial statements for 2014 and 2015.

47.     Several weeks after the above-referenced October 2015 emails, and approximately two months after the announcement of the purported acquisition of Phoenix, Zaharis emailed Parmar about creating a "sale agreement" for Phoenix and modeling it on a Northstar sale agreement that was purportedly signed on behalf of Northstar by "Bobby Kumar."  Specifically, on or about November 18, 2015, Zaharis emailed Parmar and stated, "PP, [w]e have to create a Phoenix sale agreement much like the Northstar one that we had RAI's lawyer approve.  The actual Northstar contract shared with RAI is attached.  I need your help to fill out the following for Phoenix … For Northstar, we had 'Bobby Kumar' ….. who will we have for Phoenix?" (emphasis in original).  It is worth noting that a contract the defendants ended up drafting to document the purported Phoenix transaction used the name "Vijay Kumar," and the signature block at the end of the document listed Northstar in place of Phoenix.

## C.    **Bogus Customers and Customer Contracts**

48.     In addition to evidence of the fraudulent acquisitions described above, the investigation has revealed that numerous of the purported

customers and associated revenue of certain of Company A's subsidiaries, including the Operating Company, are fictitious.

49.     During the due diligence phase of the Go-Private Transaction, the Private Investment Firm was interested in seeing revenue and earnings data supporting Company A's organic growth rate.  In this regard, during the due diligence, the co-conspirators sent the Private Investment Firm information concerning customer revenue for the Operating Company, among other entities.  For instance, on July 22, 2016, Chivukula sent an email to representatives of the Private Investment Firm copying Parmar and Zaharis. The email attached an Excel spreadsheet entitled "[Company A] Client – State – Fee – Tenure – Speciality collections and transactions.xlsx."  The body of the email stated: Attached is the collections and # of transactions data from 2013 to 2016."  The spreadsheet included revenue figures for 2015 for approximately 33 purported customers of the Operating Company.  The investigation has revealed that these customers either did not exist or had no relationship with the Operating Company.  Indeed, the FBI has obtained records from a company that provides temporary office space in the United States and elsewhere, and virtual office space, indicating that, in or around late January 2016, Zaharis leased temporary office space at various locations throughout the country for these same 33 companies.  This evidence suggests that the co-conspirators simply made up these customers (and the associated revenue) and then attempted to create real addresses for them by leasing office space in their names.

50.     The co-conspirators employed similar tactics to fabricate customers of MDRX.  Specifically, there were approximately 44 customers associated with MDRX in Company A's accounting records and in some of the financial records that the co-conspirators provided the Private Investment Firm during its due diligence.  Law enforcement reviewed nine customer contracts between a medical billing entity that MDRX claimed to have acquired and purported medical providers.  These medical providers are listed in certain of MDRX's financial records as customers of MDRX.  Open source searches revealed that the addresses for the medical providers as set forth in the contracts are temporary office addresses.  Representatives of these office locations have confirmed with law enforcement that they have no record of the purported MDRX customers doing business or occupying space there.  Additional open source searches regarding the names of the individuals who purportedly signed these contracts on behalf of the medical providers revealed no affiliations between the names in the contract and the entity for which that person signed.  This further demonstrates the fraudulent nature of these contracts, and MDRX more generally.  Further, law enforcement has been unable to confirm through open source searches the existence of the remaining 35 MDRX customers at the addresses listed for the customers in Company A's records.

51.     These findings are corroborated by email communications between the co-conspirators.  For example, on July 22, 2016 (more than five months after Company A announced its acquisition of MDRX), and the same day the

co-conspirators sent the Private Investment Firm the spreadsheet of customer

revenue figures discussed above, Zaharis sent Parmar an email that stated:

> Paul,
>
> For the audit we will need to prepare client contracts for MDRX
> physicians that we now have on our books. We have to create 60+
> agreements that we inherited as part of the acquisition.  We need these
> for [the Accounting Firm] plus maybe also for the legal due diligence
> schedule for [the Private Investment Firm].
>
> I need your help on the following:
>
> - I need to know the name of the entity we should say is signing the
>   agreements.  I don't think we should use MDRX as per the Asset
>   Sale Agreement but another name .....can you suggest one to use?
>   It will be the same name that we will use for the company wide
>   expenses we are going to create for their P&L.

52.    On or about November 16, 2016, Zaharis sent an email to

Company A's outside counsel requesting that counsel create several "Delaware

LLC's," including "Apex Healthcare LLC[.]"  As noted above in paragraph 26, on

or about September 23, 2016, Zaharis told Chivukula that they had previously

said they had acquired MDRX from "APEX healthcare systems."

53.    The co-conspirators' creation of false records to conceal their

scheme continued even after the Go-Private transaction closed.  For instance,

on or about February 22, 2017, Zaharis emailed Parmar seeking a telephone

number to use on certain purported customer invoices.  The email stated, "If

you have [a] spare parked T-Mobile number ....can we change it to Ohio centric

so we can use it on the invoices we send from Apex Healthcare Systems[?]

Then we put it in a phone and record a suitable message as well[.]  We say

Apex was in Dayton so it should be a Dayton area code which is 937[.]"  This

26

email, and others collected in the investigation, suggests that the co-conspirators simply fabricated customer invoices to create the appearance of real customers that generated revenue to Company A.

**D.**   **Fabricated and Altered Bank Statements**

54.   In addition to the above, the co-conspirators also altered records relating to the Operating Company's bank accounts to create fictitious revenue to the Operating Company.  The Operating Company's revenue, as Company A's primary subsidiary, had a significant impact on Company A's overall financial performance.

55.   Email correspondence among the co-conspirators demonstrates their efforts to alter bank records and, in some instances, to create them from scratch.  With some of the emails, the co-conspirators attached the phony bank statements in Microsoft Word or Excel form.  For example, on or about February 20, 2016, Chivukula emailed Parmar and Zaharis and attached numerous documents.  The body of the email stated, "Paul[,] attached are the bank statements in excel and pdf.  I am not able to get the bar code for Nov and December in the right format in word.  Thanks, Ravi."  Similarly, on or about January 25, 2017, Zaharis emailed Parmar and discussed the placement of a wire transfer into a bank statement.  The email stated, "I don't think we make it on page 1 … I think we have it as the 1st one on page 2[.]  We will need to change the complete description … we can cut and paste the one from page 97 that you did … where you made it $1.1m[.]  We will need to tweak [a] few things from the one wire to the new one ..the TFN and the month/date."

27

56.    Additionally, a comparison of some of the bank account statements that the co-conspirators created in Excel form and the real bank records from the bank reveal substantial discrepancies.  As just one example, the Operating Company's January 2016 account statement that the Government obtained directly from the bank reflects an incoming wire transfer on January 29, 2016 in the amount of $43,673.  The source of the wire transfer is Company A. Company A's bank records also show the corresponding outbound wire to the Operating Company.  However, a fabricated bank statement that the co-conspirators created for the same account during the same time period attributes this incoming wire transfer to an account belonging to "Chiropractic Care," a purported customer entity that law enforcement has confirmed to be fictitious.  The Operating Company's general ledger also claims that this transfer was for a receivable from "Chiropractic Care."  The phony entries in the fake bank statement and the general ledger made a simple transfer of funds from Company A to the Operating Company appear to be revenue from a legitimate, third-party source.

57.    The co-conspirators also generated fake bank account statements for MDRX which, as explained above, is a bogus entity that the co-conspirators created in furtherance of the scheme.  In or around March 2017, Zaharis and Chivukula discussed the details of various debits and credits in the purported bank account of MDRX.  In the email, Zaharis wrote, "Need to clean this up and to also include amount less bank charges transferred to main account [of the Operating Company] which will then mean a deposit entry in the main

28

chase account on the same day." The email attached a purported MDRX bank statement constructed in Microsoft Excel. Law enforcement confirmed with the bank reflected on these statements that it has no record of any accounts associated with MDRX.

**E.**   **Impact of the Fraud on Company A's Financial Statements**

58.   The scheme had a substantial impact on Company A's financial statements and resulted in grossly inflated revenue, income, and EBIDTA figures for the time period that the Private Investment Firm evaluated in determining to pursue to the Go-Private Transaction.

59.   The co-conspirators' scheme to defraud was uncovered in or around September 2017, at or around the time the co-conspirators resigned from their positions with Company A or were terminated. On or about March 16, 2018, Company A and numerous of its affiliated entities filed a petition for Chapter 11 relief in the United States Bankruptcy Court, Eastern District of New York. The petition attributes Company A's financial demise, in large part, to the scheme described above.

**THE DEFENDANT PROPERTIES**

60.   Based on a review and analysis of bank account records, email correspondence, business records, and publicly available documents, it is believed that Parmar and Zaharis diverted funds obtained through the scheme to defraud either to purchase or to retain ownership of several real properties, including the defendant properties. In order to obtain or retain an ownership

interest in the defendant properties, Parmar used several bank accounts under his control to receive and disburse proceeds related to the fraudulent scheme. In addition to using the proceeds of the illegal manipulative trading to perpetuate the securities fraud scheme, Parmar and Zaharis also used the proceeds of the fraud scheme to purchase various real properties.  Parmar and Zaharis's purchases of real properties using proceeds appear to have been meant to conceal the nature, source, location and ownership or control of the proceeds, as none of the real properties purchased with proceeds of the scheme are held in the names of either Parmar or Zaharis.

**A.**     **The Accounts Used to Facilitate the Fraud**

61.    The primary accounts through which Parmar funneled proceeds obtained from the fraudulent scheme and from which he subsequently purchased properties or gained a personal interest in properties include the following:

(1) an account at M&T Bank ending in 5647 in the name of Constellation Healthcare Technologies, Inc. (the "Constellation M&T Acct 5647");

(2) an account at M&T Bank ending in 8132 in the name of Constellation Healthcare Technologies Inc. (the "Constellation M&T Acct 8132");

(3) an account at M&T Bank ending in 1472 in the name of Ranga Bhoomi LLC (the "Ranga Bhoomi M&T Acct 1472"); and

(4) an account at M&T Bank ending in 1456 in the name of Aquila Alpha LLC (the "Aquila Alpha M&T Acct 1456").

**Constellation M&T Acct 5647**

62.    M&T Bank records show that Constellation M&T Acct 5647 was opened on December 19, 2014.  The authorized persons on the account were

Paul Parmjit Parmar, 19 Colts Gait Lane, Colts Neck, New Jersey, as Chief Exective Officer ("CEO") of Constellation Healthcare Technologies, Inc., and Ravi S. Chivuklua, 24333 Cinco Terrace Drive, Katy, Texas, as Chief Financial Officer ("CFO") of that company.

63.     This account was used to receive approximately $50 million in proceeds from the secondary stock offerings referenced in paragraphs 12 and 24 above, between on or about June 11, 2015 and January 8, 2016.  As alleged in said paragraphs, in furtherance of their scheme to defraud, the co-conspirators falsely conveyed that the secondary stock offerings were used to raise money for purported acquisitions, when, in reality, the capital raised was used for other purposes.

64.     Prior to the transfer(s) of approximately $50 million in proceeds from the fraudulent secondary stock offerings to Constellation M&T Acct 5647, the account had a balance of zero, as of January 1, 2015.  These funds were subsequently transferred to Constellation M&T Acct 8132.  There were then a series of transfers from Constellation M&T Acct 8132 back to Constellation M&T Acct 5647.  The proceeds from some of these transfers were used to purchase property or gain personal control of property, as specified in paragraphs 90-130 below.

**Constellation M&T Acct 8132**

65.     M&T Bank records show that Constellation M&T Acct 8132 was opened on December 19, 2014.  The authorized persons on the account were Paul Parmjit Parmar, 19 Colts Gait Lane, Colts Neck, New Jersey, as CEO of

Constellation Healthcare Technologies, Inc., and Ravi S Chivuklua, 24333 Cinco Terrace Drive, Katy, Texas, as CFO of that company.

66.     Approximately $50 million in proceeds from the fraudulent secondary stock offerings employed in furtherance of the scheme to defraud were transferred into this account from Constellation M&T Acct 5647.  Some of these proceeds were then transferred back to Constellation M&T Acct 5647, and some of the proceeds were used to purchase property, as specified in paragraphs 90-130 below.

**Ranga Bhoomi M&T Acct 1472**

67.     M&T Bank records show that Ranga Bhoomi M&T Acct 1472 was opened on February 1, 2016 in the name of Ranga Bhoomi LLC, 3400 Route 35 South, Suite 9, Hazlet, New Jersey 07730.  A Delaware Certificate of Formation included in the M&T Bank records indicates that Ranga Bhoomi was formed five days before the account opening, on January 25, 2016.  The authorized persons listed on the account were as follows: (1) Salil Sharma; (2) Paul Parmjit Parmar, 19 Colts Gait Lane, Colts Neck, New Jersey; (3) Dana Lord, 19 Colts Gait Lane, Colts Neck, New Jersey; and (4) Sotirios Zaharis, 1600 Harbour Boulevard, Weehawkin, New Jersey.  The primary phone number listed for the account is the same phone number listed for Parmar on other M&T Bank account documents.  It should also be noted that the address listed for Dana Lord is the address of Parmar's primary residence.  A check of credit agency database information revealed that Lord has been associated with addresses in New York and California, but not New Jersey.

68.     Parmar and Zaharis used this account to receive approximately $15 million in proceeds from the Go-Private Transaction that they fraudulently induced the Private Investment Firm to consummate, and that they then transferred these proceeds out for the purchase of one of the defendant properties.

**Aquila Alpha M&T Acct 1456**

69.     M&T Bank records show that Aquila Alpha M&T Acct 1456 was opened on February 1, 2016 in the name of Aquila Alpha LLC, 3400 Route 35 South, Suite 9, Hazlet, New Jersey 07730. The authorized persons for the account are listed as Individual A, 99 Teaneck Road, Ridgefield, New Jersey, and Sotirios Zaharis, 1600 Harbour Boulevard, Weehawkin, New Jersey.  A Delaware Certificate of Formation in the M&T Bank records indicated that Aquila Alpha LLC was formed on January 22, 2016 with Individual A listed as an authorized person.

70.     The primary phone number for Aquila Alpha M&T Acct 1456 and the phone number listed for Individual A is the same phone number listed for Parmar on the other M&T Bank account documents, most of which pre-dated this account.

**B.      Control of Ranga Bhoomi LLC, Aquila Alpha LLC, and Other Business Entities by Parmar and Zaharis**

71.     Parmar and Zaharis controlled both Ranga Bhoomi LLC and Aquila Alpha LLC, as well as other business entities connected with the purchase of the defendant properties.  Parmar was responsible for the formation of Ranga

Bhoomi LLC and Aquila Alpha LLC, and for setting up the company accounts at M&T Bank.

72.     In an email dated January 25, 2016, Parmar asked an attorney at Law Firm 1 to "please register this firm as well under the name Salil Sharma Ranga Bhoomi LLC." He then asked the attorney to send him the incorporation certificates for several entities including "Aquila Alpha LLC – Individual A, Aquila Gamma LLC – Individual A, Aquila Vega LLC – Individual A, Aquila Cadens LLC – Individual A and Ranga Bhoomi – Salil Sharma."

73.     In an email dated January 28, 2016, sent by Parmar to an employee of M&T Bank, Parmar asked the employee to open two accounts on his behalf. The first account would be in the name of Ranga Bhoomi LLC with the account owner listed as Salil Sharma. Other authorized signatories on the account were Dana Lorann Selkirk Lord, Esq., Paul Parmar, and Sam Zaharis. Parmar wrote in the email that Ranga Bhoomi LLC would be used to provide Constellation Healthcare Technologies, Inc. with in-house legal consulting services.

74.     The second account was in the name of Aquila Alpha LLC with the account owner listed as Individual A. The authorized signatories were Individual A and Sam Zaharis. Parmar wrote in the email that he (Parmar) would be using the account to acquire assets. Parmar forwarded Certificate of Formation documents for Ranga Bhoomi LLC and Aquila Alpha LLC to the bank employee as attachments to the email.

75.     Other emails show that Parmar and Zaharis, in order to conceal their involvement, pretended to be Individual A in communications on several business deals, including those pertaining to the defendant properties.

76.     For example, in an email dated January 15, 2016 regarding the Colts Neck property, sent from Individual A's email account, a person purporting to be Individual A asked a Deutsche Bank employee to set up a meeting to discuss the purchase of the Colts Neck property mortgage by Aquila Alpha LLC. The email is signed "Regards, Sam Zaharis," not Individual A.  About twenty minutes later, another email was sent to the Deutsche Bank employee from Individual A's email account stating "Apologies Joushua, I had a bunch of emails open and I cut and pasted a wrong email reply to you in my last email!"

77.     A series of emails on February 9, 2017 regarding the 50 Riverside Condo purchase also demonstrate that Parmar and Zaharis pretended to be Individual A.  In an email on February 9, 2017 from Zaharis to Parmar, with the subject line "Attorney A" (the attorney for the 50 Riverside Condo purchase and the foreclosure by Aquila Alpha LLC on the Colts Neck property), Zaharis wrote, "I called his office and left a message as [Individual A] on his voicemail  Can you please send me his cell phone number  Can you send me the password for the [Individual A] email ID."

78.     Later that day, Parmar sent Zaharis an email stating, "Sent you an email from timer (sic) account what I sent to [Attorney A]."  In an email at about that same time, Parmar forwarded to Zaharis an email from Individual A's email account to Attorney A with the subject "Where can I reach you."  The email, from

someone purporting to be Individual A, asked Attorney A about the foreclosure process (presumably on the Colts Neck property) and then asked Attorney A to handle the real estate purchase of the 50 Riverside Condo.  The email ended with "please feel free to call me at 732███████  Individual A."  The phone number provided in the email is the same phone number listed for Zaharis in M&T Bank records.

79.    The subject line of the email from Parmar to Zaharis stated, "FYI he may call you."  Zaharis responded back to Parmar shortly after and wrote, "I have made sure my vm greeting does not mention a name at all."

80.    In a separate email at around this same time, Zaharis again asked Parmar for the password for Individual A's email account.  A short time later, Parmar sent the password to Zaharis.

81.    Finally, on February 15, 2017, an email was sent from an employee of Law Firm 2 to Individual A's email account regarding the details of the 50 Riverside Condo purchase.  The employee began the email by addressing Individual A by name.  A response was then sent to the law firm employee and, as with the January 15, 2016 email to Deutsche Bank described above, the email was signed "Regards, Sam Zaharis."

C.    **Proceeds from the Fraudulent 2015 and 2016 Secondary Stock Offerings**

82.    As mentioned above, Company A raised approximately $15.8 million in a 2015 secondary stock offering on the AIM and $36 million in a 2016 secondary stock offering on the AIM.

83.     Regarding the first equity raise, a review of M&T Bank records shows two June 2015 wire transfers to Constellation M&T Acct 5647 from Finncap Limited, a British investment banking firm that, among other things, assists AIM companies in raising funds.   The first wire transfer deposit was on June 11, 2015, for $12,739,017.94, and the second wire in was on June 16, 2016, for $3,040,879.49.   Then, on June 26, 2015, $15,779,897 was transferred from Constellation M&T Acct 5647 to Constellation M&T Acct 8132.   The balance in Constellation M&T Acct 8132 just prior to this incoming transfer was approximately $80,000.   Numerous payments were made from Constellation M&T Acct 8132 including payments to Orion Health Corp, transfers back to Constellation M&T Acct 5647, and a wire for the down payment for the purchase of one of the defendant properties.

84.     In connection with the second equity raise, bank records show a wire transfer deposit on January 8, 2016 to Constellation M&T Acct 5647 in the amount of $36,876,684.14 from the London account of Finncap Limited.   Also on the same day, January 8, 2016, all of these funds were transferred from Constellation M&T Acct 5647 to Constellation M&T Acct 8132.   The balance in Constellation M&T Acct 8132 just prior to this transfer was approximately $83,000.   Numerous payments were made from Constellation M&T Acct 8132, including payments to Orion Health Corp, transfers back to Constellation M&T Acct 5647, and payments made in connection with the defendant properties.

**D.**   **Proceeds from the Go-Private Transaction**

85.   Proceeds from the Go-Private Transaction were initially sent to a law firm acting as escrow agent for certain Parmar-controlled entities and some of those proceeds were then transferred to various third parties on behalf of Parmar.

86.   A document titled "Agreement and Plan of Merger," which detailed the terms of the Go-Private Transaction, stated that Company A's stockholders would have the right to be paid $2.93 for each share of common stock outstanding immediately prior to the Go-Private Transaction.   As described above, Parmar and various entities controlled by him, received the majority of the proceeds from the Go-Private Transaction.   The payment of the common stock purchase proceeds was initially made in a series of wire transfers in February 2017 to Law Firm 1, the firm acting as escrow agent on behalf of the Parmar-controlled entities.

87.   In a January 25, 2017 email from Zaharis to an employee of Capita Asset Services, the entity responsible for distributing payments to stockholders for outstanding shares of common stock (the "Paying Agent"), Zaharis informed the employee that Law Firm 1 had agreed to act as the escrow/collection agent for all amounts due to several parties (stockholders) and would, in turn, distribute the funds to those parties.   The names of the stockholders to receive payment were included in the email.

88.   The stockholder entities listed in the email included Vega Advanced Care LLC and Axis Medical Services LLC.   Documents attached to the email

38

indicated that Vega Advanced Care owned 2,967,033 shares of common stock and Axis Medical Services owned 2,991,808 shares of common stock.  At a price of $2.93 per share, these share totals would result in a total payout of $8,693,406 to Vega Advanced Care and $8,765,997 to Axis Medical Services. The documents were purportedly signed by Individual A as the beneficial and registered owner of the outstanding shares.

89.    On July 28, 2017, an employee of Law Firm 1 sent an email to Zaharis and Parmar attaching a ledger of the Law Firm 1 escrow activity.  Under the heading "Constellation Health/CHT Clsing," the ledger showed a series of eight wire transfers from the Paying Agent on February 3, 2017 totaling approximately $46 millon.  These wire transfers represented proceeds from the fraudulently induced Go-Private Transaction.  Included in the wire transfer list was one for $8,693,406 (the amount of the Vega Advanced Care payout) and another for $8,765,997 (the amount of the Axis Medical Services payout).

**E.    Proceeds of the Fraudulent Secondary Stock Offerings and the Fraudulently Induced Go-Private Transaction Were Used to Purchase and/or Retain Ownership of the Defendant Properties**

***2 River Terrace, Unit 12J, New York, New York***

90.    A search of public records indicates that the property located at 2 River Terrace, Unit 12J, New York, New York was purchased by 2 River Terrace Apartment 12J LLC on February 19, 2016, for $5,450,000.00.  The address listed on the deed for the buyer is that of Law Firm 1.

91.    In an email dated December 14, 2015, with the subject line "2 River terrace #12JK," a real estate broker asked an employee of Law Firm 1 to verify

information so that a deal sheet could be written up.  In the email, the buyer was listed as Paul Parmar with an all cash purchase price of $5,450,000.00.  The real estate broker asked to confirm the buyer's name if it was being bought by an LLC.

92.    The employee of Law Firm 1 forwarded this email to Parmar, told him they confirmed, and asked Parmar to provide the name.  Later on December 14, 2015, the Law Firm 1 employee emailed the real estate broker and said the buyer would be 2 River Terrace Apartment 12J LLC.  Parmar was also copied on the email.

93.    On December 21, 2015, an employee of  Law Firm 1 sent another Law Firm 1 employee an email with the subject line "FW: Greene to 2 River Terrace Apartment 12J, LLC – 2 River Terrace, Unit 12J, New York, NY" and wrote in the email, "Adam-Attached is the contract for Paul's signature (3 signature pages plus lead paint waiver on last page). Together with the signed contract we will need a wire in the amount of $545,000 payable to [Escrow Agent A].'"

94.    The attached contract for the purchase of the 2 River Terrace Condo listed a purchase price of $5,450,000 and a down payment amount of $545,000.  The signature block of the contract contained a signature line for Paul Parmar as Manager of 2 River Terrace Apartment 12J, LLC.

95.    M&T Bank records indicate that on December 23, 2015, a wire transfer for $545,000 was made to Escrow Agent A from Constellation M&T Acct 8132.  As described above, in paragraph 42, in June 2015, approximately $15.8

million from the first public offering was transferred to Constellation M&T Acct 8132 from Constellation M&T Acct 5647. As of December 23, 2015, just prior to the Escrow Agent A wire, the balance in Constellation M&T Acct 8132 was approximately $1.9 million. Approximately $520,000 of this amount was proceeds from the June 2015 transfer from Constellation M&T Acct 5647.

96.    On December 29, 2015, there is a chain of emails with the subject line "2 River Terrace App. LLC Question." In one email, a real estate broker emailed an employee of Law Firm 1 and copied Zaharis. In the email the real estate broker wrote, "they are asking who will occupy the apt. What name(s) would you like me to type here?"

97.    Zaharis forwarded this email to Parmar and wrote, "Adam suggests not putting you down at this stage – do we put down Salil?" Parmar responded to this email and told Zaharis to "[p]ut Salil and Kiran Sharma."

98.    In connection with the balance of the purchase price, on February 19, 2016, a wire for $5,058,408.81 was sent from Constellation M&T Acct 8132 to Law Firm 1's NY IOLA Attorney Escrow Account. As described in paragraph 39 above, approximately $36 million in proceeds from the second equity raise was deposited into Constellation M&T Acct 8132 on January 8, 2016. As of the date of the wire to Law Firm 1, approximately $20 million of the second equity raise proceeds remained in the account.

**18 and 19 Colts Gait Lane, Colts Neck, New Jersey - Purchase of the Deutsche Bank Mortgage by Aquila Alpha LLC**

99.    On or about March 15, 2000, Parmar purchased vacant land at Colts Gait Lane, Colts Neck, New Jersey (later referred to as 19 Colts Gait Lane),

41

for $1,150,000.00.  There was no mortgage recorded for the purchase.  Then, on or about December 2, 2003, Parmar purchased more vacant land at 18 Colts Gait Lane, Colts Neck, New Jersey for $1,745,000.00.  There was no mortgage recorded for this purchase either.

100.  Parmar later developed the land and took out the following mortgages:  (1) Morgan Stanley Dean Witter Credit Corporation for $10 million in December 2004; (2) Citibank Federal Savings for $4 million in May 2006; and (3) Citibank Federal Savings Bank for $12 million in November 2006, which was issued as a Home Equity Line of Credit.

101.  On or about January 25, 2008, Deutsche Bank issued a mortgage to Parmar secured by the property in the amount of $23,700,000.

102.  On or about May 6, 2010, Deutsche Bank filed a Notice of Lis Pendens for the foreclosure of the $23,700,000 mortgage issued on January 25, 2008.

103.  In 2011, a sheriff's sale of the Colts Neck Property was scheduled. However, the sheriff's sale did not take place and the property remained in Parmar's control.

104.  In late 2015 and into early 2016, Deutsche Bank entered into loan work out negotiations in an effort to arrange a payoff on the $23,700,000 mortgage.  A series of emails show that Deutsche Bank eventually came to an agreement in which they would sell the $23,700,000 mortgage to Aquila Alpha LLC for a total purchase price of $3.8 million.  A Note Sale Agreement dated March 2, 2016, by and between Deutsche Bank and Aquila Alpha LLC, stated

that Aquila Alpha LLC would purchase the $23,700,000.00 mortgage given to Parmar from Deutsche Bank for a purchase price of $3,800,000. The Note Sale Agreement was signed for the purchaser by Individual A, Manager, Aquila Alpha LLC.

105. The funds used to purchase the Deutsche Bank mortgage were derived from the proceeds of the second fraudulent secondary stock offering, as follows. As described in paragraph 84 above, bank records show a wire transfer deposit on January 8, 2016 to Constellation M&T Acct 5647 in the amount of $36,876,684.14 from the London account of Finncap Limited. That same day, all of these funds were transferred from Constellation M&T Acct 5647 to Constellation M&T Acct 8132. Then, on March 30, 2016, $3.8 million was transferred back from Constellation M&T Acct 8132 to Constellation M&T Acct 5647. Just prior to this transfer, approximately $11 million remained in Constellation M&T Acct 8132 from the January 8, 2016 transfer of $36,876,684.14.

106. On the same day as the $3.8 million transfer into Constellation M&T Account 5647, a $3.8 million wire transfer was made out of Constellation M&T Account 5647 to the Law Firm 2 Escrow Account. The wire transfer instruction stated, "Aquila Alpha – DB Debt Purchase." The balance in Constellation M&T Acct 5647 was approximately $150,000 just prior to the above transfers.

107. On or about March 31, 2016, an Assignment of Mortgage was filed between Deutsche Bank and Aquila Alpha LLC in which Aquila Alpha LLC took ownership of Deutsche Bank's $23,700,000 mortgage in exchange for the

payment of $3.8 million.  According to the Assignment of Mortgage, the buyer, Aquila Alpha LLC, was represented by Law Firm 2.

108.   Following the Assignment of Mortgage to Aquila Alpha LLC, Parmar retained ownership of the Colts Neck Property.  While Individual A is listed as the Manager of Aquila Alpha LLC, Parmar appears to be the person in control of the company.

109.   On or about November 7, 2016, Aquila Alpha LLC filed a Notice of Lis Pendens Complaint for Foreclosure against Paul Parmjit also known as Parmjit Singh Parmar also known as Parmjit Parmarpar, and other persons and entities.  The lis pendens, which was filed by Law Firm 2, lists the lands and premises affected as the Colts Neck Property.

***Purchase of Residence at 40 Broad Street, Unit 20FG, New York, New York***

110.   A search of public records indicates that the 40 Broad Street Condo was purchased by Dioskouroi Kastor Polydeuces LLC on August 8, 2017, for $1,640,000.00.  The address listed on the deed for the buyer is 3400 Highway 35, Suite 9A, Hazlet, New Jersey.  The buyer's attorney is listed on the deed as Law Firm 2.  The seller is listed on the deed as Five G Enterprises LLC.

111.   Certain correspondence regarding the purchase of the property was made from Individual A's email account and purportedly from a person claiming to be Harmohan Parmar, using a Gmail account ("the Harmohan Parmar Gmail account").  However, Parmar and Zaharis were responsible for arranging the purchase of the property and for providing the funding to purchase the property.

44

In an email dated June 2, 2017, Parmar instructed Zaharis to name the company for "billu's apartment" Dioskouroi Kastor Polydeuces LLC.

112.   Also on June 2, 2017, an email sent from Individual A's email account to an employee of Law Firm 2 outlined details of the proposed purchase and then stated, "If you have any questions, please call me any tome (sic) on 732 ████████," which, as described above, is the phone number Zaharis listed as his phone number on various bank account documents.   The email was signed "Regards, [Individual A]."

113.   On July 13, 2017, an employee of Law Firm 2 sent an email to Individual A and the Harmohan Parmar Gmail account with the subject "Contract-40 Broad St Unit 20FG" and wrote, "[Individual A]/Harry-Attached please find the execution copy of the Contract. Please sign pages 12, 15 and 18 with title as 'authorized signatory' of DIOSKOUROI KOSTOR POLYDEUCES LLC." This email was then forwarded from the Harmohan Parmar Gmail account to Zaharis.   The contract stated a purchase price of $1,640,000 and also stated that the proposed occupant of the Unit would be Harry Parmar.

114.   Zaharis then emailed Parmar and two employees at Law Firm 1 with instructions to wire $1,623,600.00 to the Law Firm 2 Attorney Escrow Account.

115.   Then, also on July 13, 2017, $1,623,600.00 was wired from Law Firm 1 to Law Firm 2.   A review of the Law Firm 1 escrow ledger, described above in paragraph 89, displaying a $1,623,600.00 wire from Law Firm 1 to Law Firm 2 on July 13, 2017, shows that the funds came from the Constellation Health/CHT Clsing escrow account.   As outlined above, in paragraph 89, the

Constellation Health/CHT Clsing escrow account is the account into which the proceeds for the fraudulently induced Go-Private Transaction were placed. Accordingly, the funding for the purchase of the 40 Broad Street Condo came directly from the fraudulently obtained Go-Private Transaction proceeds.

116.   On the same day, Parmar sent an email to Zaharis and wrote, "Sam lets try last shot, say full funds to close the transction have been wired to our attorneys, we after looking at all the things and upcoming abatement and exemption being over in 5 and 2 years leading to massive increase in monthly cost, would like to make a final offer of $1.55m, as you know funds have been wired so as soon as you accept this offer the deal can close."

117.   Shortly after this email, Zaharis emailed Parmar with the subject line "40 Broad Street."  In the email was a lengthy script, made to appear as if it was from Individual A, listing the reasons they wanted to offer "$1.55m" for the property.

118.   Parmar responded to this email and told Zaharis, "Yes send."

119.   An email was then sent from the Individual A's email account to two employees of a New York real estate broker containing the same lengthy script that Zaharis had sent to Parmar earlier.

120.   An email dated August 6, 2017 to Zaharis from the Harmohan Parmar Gmail account, with the subject line "Five G Enterprises LLC to Dioskouroi Kastor Polydeuces LLC – 40 Broad Street, Unit 20FG, New York, NY 10004" stated, "we wired 1,623,600.00  we gave seller 164000  remaining amount 145960."

**Purchase of the Residence Located at 50 Riverside Boulevard, Apt 21B, New York, New York**

121.  A review of public documents, bank records, and email correspondence between Parmar and others indicate that Parmar used funds generated from the fraudulently induced Go-Private Transaction to purchase the 50 Riverside Condo in the name of a company he controlled.

122.  On February 6, 2017, Parmar emailed a broker from a New York City real estate firm regarding condo units at 50 Riverside Boulevard. He wrote, "thank you for showing us the place last night" and made an offer to purchase the unit for $14.8 million cash.  He wrote, "you can consider this as a firm offer which will be immediately backed by cash posted to escrow for the sole purpose of this acquisition till we finish all relevant paperwork."

123.  In a February 8, 2017 email to Parmar and Zaharis from a broker at a New York City real estate firm with the subject "21B," the broker  informed Parmar that his cash offer of $14,800,000 for the purchase of the unit had been accepted by the seller.

124.  Parmar then emailed Zaharis and suggested that their attorney, Attorney A, should set up two companies, Aquila Altair LLC and 21B One River Park, LLC.  Parmar wrote in the email that "red fronted Macau trust" will own Aquila Altair LLC and Aquila Altair LLC will own 21B One River Park LLC.  The apartment, the 50 Riverside Condo, would be owned by 21B One River Park LLC. Parmar then asked in the email, "How did we setup 2 River Terrace?"  This question was apparently a reference to another residential property in New York City purchased by Parmar and Zaharis in or about February of 2016.  From a

review of public records, it appears that Law Firm 1 participated in this real estate transaction.

125.   The next day, in an effort to clarify the best way to keep certain details of the transaction hidden, Zaharis responded to Parmar's email and wrote, "I have a couple of questions:  I assume we isolate Law Firm 1 from this transaction 100%  Will [Attorney A] keep quiet about this   if we send the money from Law Firm 1 to Attorney A then Law Firm 1 will know something is going on  In what capacity to you engage Attorney A......as Paul Parmar who is getting foreclosed on? Me on behalf of the trust?......what do you think because Attorney A will ask for sure." At the time of this email, Attorney A was representing Aquila Alpha LLC in a foreclosure action against Parmar in connection with a defaulted mortgage on the Colts Neck Property.

126.   Then, also on February 9, 2016, Zaharis sent an email to a member of Law Firm 1, copying Parmar, regarding arrangements for the transfer of $16 million "from 2 of the Deal closing escrow accounts" to Ranga Bhoomi M&T Acct 1472.  As described above, Law Firm 1 acted as the escrow/collection agent for certain Parmar-controlled entities in connection with the payout of stock purchase proceeds resulting from the Go-Private Transaction.

127.   Zaharis requested that the money be moved in two wire transfers, the first in the amount of $8,765,997.44, which he attributed to Vega Medical Services LLC, and the second in the amount of $7,234,002.56, which he attributed to Vega Advanced Care LLC.  Zaharis stated in the email, "After the

wires are sent, you should have a zero balance for Axis Medical Services LLC and a $1,459404.40 balance for Vega Advanced Care LLC in the escrow account."

128.   Bank records show that two wire transfers were made from Law Firm 1 on February 10, 2017 to Ranga Bhoomi M&T Acct 1472, one for $8,765,997.44 and the other for $7,234,002.56.  The balance in Ranga Bhoomi M&T Acct 1472 prior to these wire transfers was approximately $370,000.

129.   The funds from these wire transfers remained in the account until three wire transfers were made out of the account to Law Firm 2 as follows: (1) $3,705,000 on February 23, 2017; (2) $11,100,000 on March 20, 2017; and (3) $60,000 on April 6, 2017.  The balance in the account after the last wire transfer was approximately $1.7 million.  There was only one other deposit ($167,500) into the account during the February 10 – April 6 timeframe. There were also sixteen deposits totaling $3,267.95 (between $201 and $212 each) from February 1, 2017 to March 31, 2017 from "ADP TOTALSOURCE."

130.   On February 10, 2017, Zaharis emailed the real estate broker with whom Parmar had previously communicated and forwarded the contact information for the attorney who would be handling the closing for the condo deal, Attorney A. Zaharis then wrote "because of confidentialty requirements, please do not mention Paul Parmar by name in any emails or paperwork in relation to this transaction. This would extend to correspondence with [Attorney A]. [Attorney A] has been briefed that a client of ours is making the investment via a LLC where the ultimate owner is a family trust. Please do not copy myself

or Paul on any direct correspondence with [Attorney A] – you can forward any emails or correspondence separately but please don't include us directly on any email chain."

131.   A search of public records indicates that the property located at 50 Riverside Drive, Unit 21B, New York, New York was purchased by 21B One River Park LLC on April 7, 2017 for $15,074,100.  The address listed on the deed for the buyer was that of Law Firm 2.

## FIRST CLAIM FOR FORFEITURE

132.   The allegations contained in paragraphs 1 through 131 of this Verified Complaint for Forfeiture In Rem are incorporated herein and made part hereof.

133.   The defendant properties, and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable to, wire fraud, in violation of Title 18, United States Code, Section 1343, and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, or a conspiracy to commit such offenses.

134.   As a result of the foregoing, the defendant properties and all property traceable thereto are subject to condemnation and to forfeiture to the United States, in accordance with 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR FORFEITURE

135.  The allegations contained in paragraphs 1 through 131 of this Verified Complaint for Forfeiture In Rem are incorporated herein and made part hereof.

136.  The defendant properties, and all property traceable thereto, are subject to forfeiture as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and/or 1957 or a conspiracy to commit such a violation, in violation of Title 18, United States Code, Section 1956(h).

137.  As a result of the foregoing, the defendant properties are subject to condemnation and to forfeiture to the United States of America for disposition according to law, pursuant to Title 18, United States Code, Section 981(a)(1)(A).

138.  WHEREFORE, plaintiff requests that notice of this action be given to all persons who reasonably appear to be potential claimants to the defendant properties; that the defendant properties be forfeited and condemned to the United States of America; that plaintiff be awarded its costs and disbursements in this action; and that the Court award such other and further relief as it deems proper and just.

CRAIG CARPENITO
United States Attorney


/s/ *Sarah Devlin*_____
By:  SARAH DEVLIN
Assistant United States Attorney

May 16, 2018
Newark, New Jersey

## **VERIFICATION**

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | : ss.: |
| COUNTY OF ESSEX | ) |

I, James Howard, hereby verify and declare under penalty of perjury that I am a Senior Inspector with the United States Marshals Service, that I have read the foregoing Verified Complaint for Forfeiture in Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

James M. Howard
Senior Inspector
United States Marshals Service

Sworn to and subscribed before me this
16 day of May, 2018, at Newark, New Jersey.

Jaclyn N. Wyrwas, Esq.
Attorney-at-Law of the State of New Jersey

53

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | The Real Properties Known As 50 Riverside Boulevard, Unit 21B, New York, New York, et al. |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Sarah Devlin, United States Attorneys Office, 970 Broad Street, 7th Fl., Newark, N.J. 07102; sarah.devlin3@usdoj.gov; 973-645-2740

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
   Plaintiff

☐ 3   Federal Question
   *(U.S. Government Not a Party)*

☐ 2   U.S. Government
   Defendant

☐ 4   Diversity
   *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                              *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal Injury Product |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
|  | ☐ 340 Marine / Liability |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  | ☐ 362 Personal Injury - Medical Malpractice |  | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  |  | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** |  | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application |  | |
|  | ☐ 448 Education / ☐ 550 Mandamus & Other | ☐ 465 Other Immigration Actions |  | |
|  | ☐ 550 Civil Rights |  |  | |
|  | ☐ 555 Prison Condition |  |  | |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
   Proceeding

☐ 2   Removed from
   State Court

☐ 3   Remanded from
   Appellate Court

☐ 4   Reinstated or
   Reopened

☐ 5   Transferred from
   Another District
   *(specify)*

☐ 6   Multidistrict
   Litigation -
   Transfer

☐ 8   Multidistrict
   Litigation -
   Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 981(a)(1)(A) and (C)
Brief description of cause:
Forfeiture of property traceable to a securities fraud violation and/or involved in money laundering

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
05/16/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Sarah Devlin

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____